IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 08-0443 MMC |
| Plaintiff, | **MEMORANDUM OF DECISION; FINDINGS OF FACT AND CONCLUSIONS OF LAW; DIRECTIONS TO CLERK** |
| v. | |
| EARL HARREL SIMS, II, | |
| Defendant. / | |
| KAP SUK SIMS, | |
| Petitioner / | |
| UNITED STATES OF AMERICA, | No. C 08-5023 MMC |
| Plaintiff, | |
| v. | |
| APPROXIMATELY $57,378.00 IN UNITED STATES CURRENCY, | |
| Defendant. / | |
| KAP SUK SIMS, | |
| Claimant. / | |

The above-titled consolidated action is before the Court for trial on a stipulated record. In particular, plaintiff United States of America (the "Government") and claimant

Kap Suk Sims ("Sims") agreed, by written stipulation (see Doc. No. 76, Case No. C 08-5023) and on the record at a Case Management Conference (see Doc. No. 79, Case No. C 08-5023), to submit the cases for final determination based on the record presented in connection with the briefing on the Government's motion for summary judgment (see Doc. No. 56, Case No. C 08-5023 (hereinafter, "Mot. for Summ. J.")).  The parties further requested the Court, based on said record, make any credibility determinations necessary to rule on the merits.  (See Doc. No. 79, Case No. C 08-5023)

## BACKGROUND

The instant consolidated action concerns $57,378 in United States currency "seized as money furnished or intended to be furnished by a person in exchange for a controlled substance, or money traceable to such an exchange," in particular, money seized from Sims's son, Earl Sims, as part of a narcotics investigation.  (See Doc. No. 1, Case No. C 08-5023 (hereinafter, "Compl.") ¶¶ 1, 9-12.)

On August 12, 2009, Earl Sims pled guilty to conspiracy to commit a narcotics offense and unlawful possession of false identification documents, stating the subject $57,378 "belonged to [him] and [his] cousin Miquel Thomas," and that they intended to "use the money to buy six pounds of marijuana in the San Francisco area, and then ship the marijuana bank to Atlanta, Georgia where [they] would resell it and split [their] profits." (See  Doc. No. 24, Case No. CR 08-443 (hereinafter, "Plea Agreement") ¶¶ 1-2.) Additionally, as part of his sentence, Earl Sims agreed to forfeit his interest in the $57,378 seized.  (See Doc. No. 48, Case No. CR 08-443.)

The Government now seeks, as against any and all claimants, forfeiture of the monies seized.

## APPLICABLE LAW

**I.  Civil Forfeiture**

Under 21 U.S.C. § 881(a)(6), "[a]ll moneys . . . intended to be furnished by any person in exchange for a controlled substance . . . and all moneys . . . intended to be used to facilitate any violation" of federal drug laws are subject to civil forfeiture.  See United

1  States v. United States CUrrency, $30,060.00, 39 F.3d 1039, 1041 (9th Cir. 1994).  Initially,
2  "the burden of proof is on the Government to establish, by a preponderance of the
3  evidence, that the property is subject to forfeiture."  See 18 U.S.C. § 983(c)(1).  Where, as
4  here, "the Government's theory of forfeiture is that the property was used to commit or
5  facilitate the commission of a criminal offense, or was involved in the commission of a
6  criminal offense, the Government shall establish that there was a substantial connection
7  between the property and the offense."  See id. § 983(c)(3).
8        If the Government meets its initial burden, the claimant, in order to avoid forfeiture,
9  must demonstrate he/she is an "innocent owner" of the defendant property.  For purposes
10 of civil forfeiture, an "owner" is defined as "a person with an ownership interest in the
11 specific property sought to be forfeited," see id. § 983(d)(6)(A), but not "a person with only
12 a general unsecured interest in, or claim against, the property or estate of another[,] a
13 bailee unless the bailor is identified and the bailee shows a colorable legitimate interest in
14 the property seized[,] or . . . a nominee who exercises no dominion or control over the
15 property," see id. § 983(d)(6)(B).  An "innocent owner" is "an owner who – (i) did not know
16 of the conduct giving rise to the forfeiture; or (ii) upon learning of the conduct giving rise to
17 the forfeiture, did all that reasonably could be expected under the circumstances to
18 terminate such use of the property."  See id. § 983(d)(2)(A).

19 **II.    Criminal Forfeiture**

20        Under 21 U.S.C. § 853(a)(2), a criminal defendant's property is subject to forfeiture
21 when it is "used, or intended to be used, in any manner or part, to commit, or to facilitate,"
22 inter alia, unlawful sale of controlled substances.  A third party claimant may defeat
23 forfeiture, however, by establishing that such party has an interest in the forfeited property
24 "superior to any right, title, or interest of the defendant at the time of the commission of the
25 acts which gave rise to the forfeiture of the property."  See 21 U.S.C. § 853(n)(6)(A).  After
26 a court enters a preliminary order of forfeiture as part of a defendant's sentence, "[a]ny
27 person, other than the defendant, asserting a legal interest in property which has been
28 ordered forfeited to the United States" may "petition the court for a hearing to adjudicate the

1 validity of his alleged interest in the property." See 21 U.S.C. § 853(n)(2).  To avoid
2 forfeiture, the petitioner must establish "by a preponderance of the evidence that
3 . . . the petitioner has a legal right, title or interest in the property and . . . the right, title or
4 interest was vested in the petitioner rather than the defendant or was superior to any right,
5 title, or interest of the defendant at the time of the commission of the acts which gave rise
6 to the forfeiture."  See 21 U.S.C. § 853(n)(6).

**DISCUSSION**

**I. Civil Forfeiture (Case No. C 08-5023)**

**A. "Substantial Connection" Between Property and Offense**

10 As noted, the Government bears the initial burden of demonstrating a "substantial
11 connection between the property and the offense."  See 18 U.S.C. § 983(c)(3).  "The
12 determination whether the government has met its burden of proof is based on the
13 aggregate of the facts, including circumstantial evidence."  See United States v. $49,790 in
14 United States Currency, 763 F. Supp. 2d 1160, 1167 (N.D. Cal. 2010) (citing United States
15 v. Currency, U.S. $42,500.00, 283 F.3d 977, 979 (9th Cir. 2002)).  Here, the Government
16 argues it has demonstrated the requisite "substantial connection," relying on the facts set
17 forth in the verified civil forfeiture complaint, Earl Sims's plea agreement, and Earl Sims's
18 deposition.[1]

19 The Government's complaint, verified by Drug Enforcement Administration ("DEA")
20 Special Agent ("S/A") Willie Byrd, sets forth the following circumstances leading to the
21 seizure of the defendant currency.

22 On June 19, 2008, S/A Byrd, acting with another DEA agent, stopped Earl Sims after
23 S/A Byrd recognized Sims from a prior encounter.  (See Compl. ¶ 9.)  When asked for
24 identification, Earl Sims provided S/A Byrd with a North Carolina's Driver's License that
25 showed a photo likeness of Earl Sims but was in the name of "Anthony Scott."  (See id. ¶

---

[1] As noted, the Court may consider Earl Sims's plea agreement (see Doc. No. 24, Case No. CR 08-443) and deposition (see Doc. No. 50, Case No. C 08-5023 (hereinafter, "Earl Sims Depo.")) as part of the record developed in the course of the parties' briefing on the Government's motion for summary judgment.

4

10.)  After a record check revealed the photo identification that Earl Sims provided was false, S/A Byrd arrested him, conducted a search incident to arrest, and discovered the defendant currency in Sims's pockets and luggage (see id. ¶¶ 10-12), wrapped in "large bundles bound together with rubber bands" (see id. ¶ 12), as well as four additional counterfeit drivers' licenses (see id. ¶ 13).  Earl Sims thereafter confessed to S/A Byrd that he planned to use the defendant currency to purchase marijuana (see id. ¶ 19) and that "he used the counterfeit identification to elude law enforcement officers and agents from questioning him." (See id. ¶ 17.)

On August 12, 2009, Earl Sims signed a plea agreement in which he admitted the currency's connection to his criminal offense.  (See Plea Agreement ¶ 1.)  In particular, as noted, Earl Sims admitted that the defendant currency "belonged to [him] and [his] cousin Miquel Thomas" and that he planned to "use this money to buy six pounds of marijuana in the San Francisco area, and then ship the marijuana back to Atlanta, Georgia . . . where [they] would resell it" (see id. ¶ 2); as part of his plea agreement, Earl Sims also forfeited his interest in the defendant currency.  (See id. ¶ 10.)  Additionally, at the time he entered his plea in court, Earl Sims orally confirmed all of the factual admissions contained in the plea agreement.  (See Earl Sims Depo. Ex. 4 at 22:9-23:5 (Transcript of Aug. 12, 2009 court proceeding).)

Subsequently, at his deposition in the civil case, Earl Sims partially recanted the admissions he made in his plea agreement, claiming first that $15,000 of the defendant currency belonged to him (see Earl Sims Depo. at 27:9-10), then that said $15,000 belonged to him and his cousin jointly (see id. at 27:11-14), and finally that only $8,000 belonged to him, $6,000 belonged to his cousin and the remainder belonged to his mother (see id. at 41:16-42:8, 61:24-66:3).  Earl Sims also stated, however, that he was "not trying to take back anything [he] said" in his plea agreement and in court.  (See id. at 30:2-3.)

The Court finds credible S/A Byrd's account of the events surrounding the arrest and seizure.  The Court also finds credible the admissions Earl Sims made during the course of the criminal proceedings, and does not find credible his subsequent statements to the extent

5

they conflict with said admissions. See United States v. Rubalcaba, 811 F.2d 491, 494 (9th Cir. 1986) (noting, as to criminal defendant's testimony during plea hearing, "[s]olemn declarations in open court carry a strong presumption of verity") (internal quotation and citation omitted).

In light of the above, the Court finds the Government has demonstrated by a preponderance of the evidence that the defendant currency is "substantially connected" to Earl Sims's criminal offense. See 18 U.S.C. § 983(c)(3); see also United States v. Currency, U.S. $42,500.00, 283 F.3d 977, 981 (9th Cir. 2002) (finding large amount of cash seized is "strong evidence that the money was furnished or intended to be furnished in return for drugs") (internal quotation and citation omitted); United States v. $242,484.00, 389 F.3d 1149, 1161-62 (11th Cir. 2004) (finding fact that cash was "bundled together with rubber bands, in non-uniform bundles in various denominations, without any bank wrappers" supported inference cash was related to drug offense); United States v. Real Property Located in North Hollywood, No. CV 06-5508 CAS (JWJx), 2009 WL 3770639 at *4 (C.D. Cal. Nov. 10, 2009) (holding real property subject to forfeiture based on admissions made in connection with claimant's guilty plea).

Accordingly, the Court finds the Government has satisfied its initial burden of demonstrating the defendant currency is subject to forfeiture.

**B. "Innocent Owner" Defense**

Because the Government has shown a "substantial connection" between the defendant currency and Earl Sims's criminal offense, Sims, in order to avoid civil forfeiture, must prove she is an "innocent owner."

**1.  Ownership**

As noted, under 18 U.S.C. § 983(d), an "owner" is defined as "a person with an ownership interest in the specific property sought to be forfeited," see id. § 983(d)(6)(A), but not "a person with only a general unsecured interest in, or claim against, the property or estate of another[,] a bailee unless the bailor is identified and the bailee shows a colorable legitimate interest in the property seized[,] or . . . a nominee who exercises no dominion or

control over the property," see id. § 983(d)(6)(B).  Sims asserts she "owns" the defendant currency, because, she claims, she acquired the defendant currency through legitimate means, $44,600 of which she deposited in a bank account at Wachovia Bank (hereinafter, "Wachovia account") and $12,788 of which she kept in cash at her residence.  (See Sims Depo. at 30:13-20, Ex. 10.)  The Government contends Sims has failed to satisfy her burden of demonstrating ownership, because, according to the Government, she has failed to present sufficient evidence to support her "various, mutating claims some of which are inconsistent and others implausible." (See Doc. No. 87, Case No. C 08-5023 (Government's Reply at 4:13-14).)

Over the course of the litigation, Sims has offered three sets of explanations as to the source of the defendant currency.  First, Sims claimed the sole source of the currency was her earnings from employment as a beauty supply store manager.  (See Mot. for Summ. J. Ex. A (Petition for Remission, filed Aug. 22, 2008), Ex. B (Petition for Seized Property, filed Nov. 6, 2009), Ex. C (Answers to Interrogatories, served Jan. 21, 2009).)  Sims next claimed the money came from two sources: her earnings as a beauty supply store manager and an inheritance from her father, who died in July 1986.  (See Mot. for Summ. J. Ex. D (Claim and Affidavit, filed Mar. 4, 2010).)  Ultimately, Sims claimed the money came from three sources: her earnings as a beauty supply store manager, the inheritance from her father, and proceeds from two family businesses, namely, Buy the Slice and Sims Rims & Tires & Towing ("Sims Rims").  (See Mot. for Summ. J. Ex. E (Answers to Interrogatories, signed by Sims Apr. 13, 2010).)

The Court finds Sims's assertion that the defendant currency came from her earnings as a beauty supply store manager lacks credibility, not only because it is inconsistent with her other explanations, but because it is inconsistent with both the form and amounts of the deposits made into the Wachovia account, the account from which she states over seventy-five percent of the defendant currency was withdrawn.  See, e.g., United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448, 466 (7th Cir. 2005) (holding currency subject to forfeiture given "documented differences between the

7

sources of income properly accounted for in [claimant's] filings and his claimed sources of income"). In particular, Sims testified that her employer at the beauty supply store paid her by check every two weeks, in amounts of approximately $1200, and that she deposited all her paychecks into that account. (See Doc. No. 57, Case No. C 08-5023 (Sims Depo. at 37-41, 83, 111) (hereinafter "Sims Depo.").) As detailed in the records maintained by Wachovia Bank, however, all of the forty-two deposits made over the five-year lifetime of the account were made in cash at irregular intervals and three-quarters of the deposits were made in amounts ranging from $7,000 to $10,000. (See Sims Depo. Ex. 20.) Sims does not dispute the accuracy of those records.

        The Court finds Sims's assertion that a portion of the defendant currency came from money she inherited from her father likewise lacks credibility, again because it conflicts with her other explanations, and, further, because she gave conflicting accounts as to when she received the inheritance and what she did with the money. In that regard, Sims initially stated, in a declaration submitted in support of her claim, the inheritance was wired from a Korean bank account and "later transferred" to a bank account for a retail business she controlled, and then transferred to the Wachovia account in 1998. (See Mot. for Summ. J. Ex. D (Claim and Affidavit submitted by Sims).) Subsequently, at her deposition, Sims testified that she kept the entire inheritance at home until the early 1990's, at which time she invested $30,000 in her beauty supply business and made a $40,000 loan, for which she has no documentation, to a woman whose last name she could not remember. (See Sims Depo. at 115:6-118:22.) Finally, later in her deposition, Sims testified that she did not receive the inheritance until her mother gave it to her in 1994 or "maybe [the] late '90s." (See id. at 152:11-153:14, 157:6-9.) Given Sims' conflicting explanations and lack of documentation in support thereof, Sims has failed to show the inheritance was a source of the defendant currency. See, e.g., United States v. $252,300.00 in United States Currency, 484 F.3d 1271, 1275 (10th Cir. 2007) (holding currency subject to forfeiture where claimant "contended he borrowed the bulk of the currency, $200,000, from [a third party], yet he could produce no documents to substantiate the transaction"); United States v. $223,178.00

in Bank Account Funds, No. SACV06-444 DOC (MLGx), 2008 WL 4735884 (C.D. Cal. April 30, 2008) (noting "[a] court may infer that forfeited property is traceable to illegal activity where the claimant fails to offer documentation, such as bills, receipts or other records to prove legitimate sources of income") (quoting United States v. 228 Acres of Land and Dwelling Located on Whites Hill Road in Chester, Vt., 916 F.2d 808, 813 (2nd Cir. 1990)).

Lastly, the Court finds Sims's assertion that a portion of the defendant currency came from two businesses, Buy the Slice and Sims Rims, lacks credibility. Income from Buy the Slice cannot be part of the currency seized in June 2008 because Sims did not open the business until August 2008. (See Mot. for Summ. J. Ex. E at 3 (Sims's Answers to Interrogatories).) As to Sims Rims, Sims states she deposited $6000 in income from that business during a three-month period from September 2004 to December 2004, and another $20,000 during a one-year period from January 2005 to January 2006, during which year she states she sold equipment from the business. (See id.) Sims's income tax returns for those periods, however, reported a net loss of $13,980 for 2004 (see Sims Depo. Ex. 16 (Sims Rims 2004 tax return) and a net loss of $9520 for 2005 (see id. Ex. 15 (Sims Rims 2005 tax return)). Further, Sims has provided no documentation for any sale of equipment.

Accordingly, the Court finds Sims has not shown she is an "owner" of the defendant currency as defined in 18 U.S.C. § 983(d)(6)(A).

**2. Innocent Ownership**

In light of the above finding, the Court need not address the question of whether Sims was aware of Earl Sims's intention to use the defendant currency to purchase marijuana. Even assuming Sims has met her burden as to ownership, which she has not, the Court finds Sims has not met her burden to show she was an "innocent owner."

An "innocent owner," as noted, is "an owner who – (i) did not know of the conduct giving rise to the forfeiture; or (ii) upon learning of the learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." See 18 U.S.C. § 983(d)(2)(A). "Because the innocent owner defense is an affirmative defense . . . it is [Sims's] responsibility to prove the absence

9

of actual knowledge." See 16328 South 43rd East Ave., Bixby, Tulsa County, Okla., 275 F.3d 1281, 1284-85 (10th Cir. 2002) (internal quotation and citation omitted).  Although Sims asserts she was unaware of the conduct giving rise to the seizure until after the seizure had occurred, the Court, as discussed below, finds Sims has not met her burden of proving the absence of "actual knowledge."

Other than her own testimony denying such knowledge, Sims offers no evidence to suggest she was unaware of Earl Sims's intention to purchase marijuana with the defendant currency.  The Court finds Sims's testimony is not credible in light of undisputed evidence presented by the Government in that regard.  In particular, as noted above, all of the forty-two deposits made into the Wachovia account between 2003 and 2008 were made in cash, and three-quarters of the deposits were in amounts ranging from $7000 to $10,000, which exceeded, by a considerable sum, Sims's monthly income from legitimate sources.  (See Sims Depo. Ex. 20; Doc. No. 48, Case No. C 08-5023 (hereinafter, "Shields Decl.") at 7-8.)[2] Further, seventeen of those forty-two deposits were in the exact amount of $9000.  Pursuant to federal law, see 31 U.S.C. §§ 5313, 5324(a); see also former 31 C.F.R. § 103.22, financial institutions were, at the time relevant to the deposits here, required to issue a Currency Transaction Report for cash deposits of more than $10,000, for the purpose of detecting money laundering and other criminal activity, and Sims admitted in her deposition that she was aware that depositing more than $10,000 would result in such a report (see Sims Depo. at 103:13-106:5).  Further, the Government has submitted credible

---

[2] In support of its Motion for Summary Judgment, the Government submitted a declaration from Rodger Shields ("Shields"), a "consultant who assists the [DEA] with complex financial investigations" and has over twenty years experience working as a Special Agent with the Internal Revenue Service's Criminal Investigation Division.  (See Shields Decl. at 2:2-15.)  Sims objects to the testimony contained in the Shields Declaration on the asserted grounds that Shields's statements are hearsay and that Shields incorrectly stated Sims's taxable income was zero in the years 2001-2008.  (See Doc. No. 59, Case No. C 08-5023.)  The Court finds Shields's qualifications, skill, training, experience and expertise, as stated in his declaration (see Shields Decl. at 2:2-22), qualify him as an expert under Rule 702 of the Federal Rules of Evidence. Further, contrary to Sims's objection, Shields's opinions are not hearsay and, further, are based on federal tax returns provided by Sims and the IRS, which Sims identified as such in her deposition and which are attached as exhibits to the deposition transcript.  (See Shields Decl. at 3:6-12.) Accordingly, Sims's objections are hereby overruled.

evidence from an expert in financial investigations, in whose opinion such "structured" deposits "are consistent with the behavior of drug traffickers." (See Shields Decl. at 9:9-16.) Sims has offered no evidence to rebut the Government's expert and, as discussed above, has not offered sufficient evidence to show a legitimate source of the deposits. Consequently, even if Sims had met her burden to show ownership, she nonetheless fails to show "innocent" ownership.

Accordingly, the Court finds the defendant currency is subject to forfeiture under 21 U.S.C. § 881.

## II.     Criminal Forfeiture (Case No. CR 08-443)

As noted, because Earl Sims agreed to forfeit the defendant currency as part of his plea agreement, the burden is on Sims to show she has "a legal right, title or interest in the property" that was "superior to any right, title, or interest" of Earl Sims at the time the property was seized. See 21 U.S.C. § 853(n)(6). For the reasons discussed above with respect to civil forfeiture, the Court finds Sims has not satisfied her burden of demonstrating she has an ownership interest in the forfeited property.

Accordingly, the Court finds the defendant currency is also subject to forfeiture under 21 U.S.C. § 853.

## CONCLUSION

In light of the above, the Court finds the defendant currency is subject to forfeiture in the amount of $57,378, together with any interest earned thereon since the time of its seizure.

The Clerk of Court is hereby DIRECTED to enter judgment in favor of the Government consistent herewith.

**IT IS SO ORDERED.**

Dated: September 4, 2012

MAXINE M. CHESNEY
United States District Judge

11